Good morning. Good morning. My name is Warren Brown. I practice in Arizona, and I represent Ed Harvey in this matter. I have categorized a little bit the procedures or the points that I want to make this morning. I would ask the Court to be aware of three significant dates. They are May 6, 2009, May 7, 2009, and May 8, 2009. Different activities took place on all three of these days, which are significant to the three issues I have raised in this appeal. I'm going to begin by telling the Court that this case developed from day one out of an application by a deputy sheriff whose name is Jeff Adams of the Community Caretaker Doctrine. You will note from the briefs I filed and the excerpts of record that the initial traffic stop that gave rise to these events was, in Jeff Adams' mind, based on the Community Caretaker Doctrine. He acknowledges there was no probable cause, no suspicion, but he wanted to stop Ed Harvey before Ed Harvey got to the school. You're not questioning the legality of the stop and the rest now on appeal, are you? The legality of that is not at issue, Your Honor. The only thing that is at issue in this context is the incarceration. Because when we move to the end of the day or close to the end of the day on May 6, approximately 430, the officer decided to incarcerate Ed Harvey on two misdemeanor charges, which coincidentally were later dismissed. The incarceration in Jeff Adams' mind was based on the Community Caretaker Doctrine. I have outlined as carefully as I could in the brief the sequence of events which leads to the conclusion that despite Jeff Adams' statement he was putting Ed Harvey in jail to, quote, protect a member of the public, namely Joanne Harvey and her mother, these people were many, many miles away. They were an hour and a half to two hours outside of a little town called Heber, Arizona, headed toward another town called Tempe, Arizona. All of this is acknowledged by Jeff Adams, and I'm not going to take the Court's time repeating it. I'm only going to say that in the final analysis, the defense position is that there's an Arizona statute, and that indeed there is, that gives a police officer discretion to cite and release or to jail. No question about it. It's the issue of discretion which I think is so critical in this matter. In the final analysis, as I understand the defense position, Jeff Adams exercised discretion, and that's the end of it. You can't question it. I disagree strongly, especially under the Community Caretaker Doctrine, when it is necessary to look at the circumstances which give rise to its application. Is there really an immediate threat? Is there really danger to the public? In this case, clearly not. One of the cases I cited, by the way, will point out to the Court that discretion is, I mean, discretion can't be a whim. Yes, Your Honor. Am I right in thinking that this very issue of the reasonableness of, is it Officer Adams, did you say? I apologize, Your Honor, I couldn't hear you. Oh. Let me just put it this way. Am I right in thinking that the issue of the reasonableness of the officer's exercise of discretion to incarcerate your client, that that issue was put to the jury, and the jury heard, you know, everything, I guess, that you and the? It was certainly argued to the jury. The jury certainly heard all the circumstances of it, but it is correct that the district court judge denied jury instruction on it. Okay. So, that's what I couldn't remember. Are you challenging the, is this a Rule 50 issue, or is it a, you asked for a new trial because the instruction you requested wasn't given on this claim? That's what I couldn't remember. Again, I'm sorry, Your Honor, I'm having difficulty hearing you. Oh, okay. Is that better? Yes, much better. Okay. On this claim, right, the unlawful incarceration claim, are you challenging just the sufficiency of the evidence to support the jury's verdict, or are you challenging the absence of a jury instruction? I couldn't remember what the nature of your attack on this claim was. I regret to advise you that I wish I had raised both, but I only raised the issue of the evidence. That's what I thought, and obviously, you know that the standard of review is very unforgiving for your client on that claim, and so maybe you could just cut to the chase. And, I mean, why was a jury compelled to find in your favor, in your client's favor on that claim? Well, the application of the doctrine that I'm talking about, community caretaker doctrine, was what was at issue from day one throughout this trial. It was argued to the jury. As a matter of fact, the defense argued specifically, and I have quoted that in the briefs. But when it came time to saying what is the justification for the application, no answer was given. It essentially was, well, he has discretion, he can do what he wants. And I'm saying that under the Sixth Circuit, I believe, and the Second Circuit, as well as other case law, it's clear that discretion must be based  But put aside whether you call it the caretaker doctrine or whatever you call it, just in terms of the facts. Didn't the officer have information suggesting that your client had threatened to harm her if she was taken away, that she'd seen him before with guns, that there were concerns that the mother might be attacked? They had been told these things about the school. The people at school were concerned because there was a gun in the background. There weren't a whole range of things that the officer had in mind as the officer made the decision that at least for a temporary period, we will incarcerate or hold the person. Your Honor, I can't say what was in the officer's mind. Let me address- I'm asking about factual support in the record. Isn't there factual support in the record which would show that the officer knew these things? And that's what the officer had in mind when the officer said, you know, I'm going to hold you for a period. Your Honor, in the record, you'll find that there had been an alleged threat. Nobody knows when, but the record as a whole would indicate it was quite some time ago. As to everybody at the school being concerned, this was a case of Joanne Harvey, according to Stacy, told her about a threat. That threat was passed on to the counselor, to the school, and everybody said, well, if there's a threat- I'm focused on the officer. It doesn't have to be true or any of that, but what did the officer know or have reason to think or believe as a possible basis for justifying detaining the plaintiff? Wasn't there information in the record to support that? If he believed that, Your Honor, it never came out. The only thing he testified to was that he did- that he put Harvey in jail to, quote, protect the ex-wife and daughter. That's it. He didn't say, I exercise this discretion to protect the school or anything else. This has all been sort of mixed into it to the point where it almost sounds factual, but it isn't. The fact of the matter is he specifically chose to apply the community caretaker doctrine that was ratified by his boss, the sheriff. It was argued, and frankly, Your Honor, I'd like to move on because I have just a couple other points. May 7th, Harvey signed a consent to search. We all know that. I have quoted extensively from Brenda Clark, who is the deputy handling that matter, that the purpose was to go seize the firearm collection that Harvey had because the order of protection required that he surrender those. On May 7th, he signed the document, also believing that the county was going to feed and water his dogs. On May 7th, the county went out and they picked up the firearms. On May 7th, the consent to search was literally over with. And yet the next day, or that day, I should say, Ron Jones decided that there were dogs, and there were, I think the actual number was 37, but in any event, there were dogs in this property on 35 acres in a fenced-in area about 100 by 100. The county had a contract with the Humane Society to take in every dog for 50,000 bucks. Instead of even making the phone call, not only to the Humane Society, but to any other option available, Ron Jones decided to have two of his fellow animal control officers show up the next morning with rifles and shoot them. I am raising that as a violation of his constitutional rights, destroying his property. And I am raising the issue that the search warrant, I'm sorry, the consent to search, which he had signed on May 7th, wasn't effective on May 8th because it was limited to the specific purposes outlined in it. Nonetheless, the county says they discovered a crime scene on May 7th, yet did nothing to secure a warrant, decided to usher Child Protective Services into the Harvey residence, which was admittedly a mess, and to do that, decided to kill the dogs. So they killed the dogs, in effect destroying Harvey's property to conduct an illegal search. Final couple of points. In the brief filed by the defendants, there's reference to qualified immunity. I just want the court to be aware, qualified immunity was never raised in this case. Never raised before, never decided by the judge. That's the first time we've really heard about qualified immunity. The second thing is heck. In heck, there's language, and I'm sure you're well aware of this, it talks about a challenge for damages in a 1983 case, in effect overturning a decision in a criminal matter. Also, in addition to overturning a decision, there's language about causing incarceration to end, or words to that effect. Neither of those are applicable here. The conviction that Harvey ultimately received was based on Child Protective Services testimony. Therefore, heck doesn't apply. Can I ask on that? Sorry if I sound like I'm yelling, but I just want to make sure you can hear me. On that claim, the unlawful search claim, was there evidence discovered in this unlawful search on May 8th that you're challenging? Was there evidence from that search that was introduced against your client at the underlying criminal trial? Yes. Okay, so on my end. Forgive me, Your Honor. It was Child Protective Services, the Division of the State of Arizona. They were ushered to the property with Jeff Adams. Jeff Adams assisted, but Jeff Adams' testimony or what he discovered was never used against Harvey. The only thing used against Harvey was the testimony of the Child Protective Services agent. Okay, but about the observations they made during the illegal search. And as I understand it, there was actually a suppression motion made to exclude any evidence that was gathered during that illegal search in the criminal trial, and that motion was denied? Your Honor, I'm sorry. I can't speak to that. I had nothing to do with the criminal proceedings, and I simply don't know. Okay, well let's go to Heck v. Humphrey. Wouldn't it go to that issue, Heck v. Humphrey? Excuse me? It would go to the very issue, though, Judge Wofford is trying to address, and that is whether you're precluded by Heck v. Humphrey. The whole argument that there was a criminal proceeding, the issue was decided there, and so to render a verdict for your client here would interfere with that. My position, I understand what you're saying. My position on that is that a decision in my favor on, I mean in Harvey's favor on this matter, does not negate the evidence or the conviction on, based on CPS or Child Protective Services conduct. It doesn't. Heck says it's got to affect that judgment. It's got to reverse it. It's got to turn the defendant loose. I know that Heck leaves this question open, but I think in a case after Heck, our court held in a case called Harvey v. Waldron that this kind of claim that you're bringing is barred under Heck. As long as evidence that was discovered in the illegal search was used in the criminal trial, you can't challenge it in the context of a Section 1983 action. That's what our court has held. I agree with you that Heck doesn't say that, but our court in binding precedent has held it, I think. Unless you tell me Harvey v. Waldron is distinguishable in some fashion. No, I'm not taking that. I'm not telling you that. Okay. Well, let's hear from the defendants. Your time is almost up, but we'll give you adequate time on rebuttal. Thank you. Thank you, Your Honors. Daryl Adelet representing Sheriff Clark, Brenda Clark, Deputy Adams, and Animal Control Officer Ron Jones, in addition to Navajo County. Thank you very much for this opportunity to appear and address the issues raised by this appeal. It strikes me that most of the cases that you folks see, civil cases, are appeals from the granting of a summary judgment. And you see a lot of those. I hear about a lot of those. I was here observing yesterday, and you heard one of those. And the contention always is that there are questions of fact that need to be decided by a jury. And we're entitled to our day in court in front of a jury. And I agree with that principle wholeheartedly. I agree with that principle so much in this case. I didn't even file a motion for summary judgment, which sort of surprised the judge here. This case overflows with questions of fact. That's why we spent eight days in jury trial. That's why there were 25 witnesses that testified. Four expert witnesses testified. And after eight days of jury trial, nine jurors unanimously found that the conduct of the defendants was reasonable under the circumstances. And I think that says a lot. It validates the system. Can I kind of work in reverse order and talk about Heck first? Not only does Harvey versus Waldron say what Judge Oliver said, but a subsequent case called Guerrero versus Gates that didn't make it into our briefing because he kind of raised this issue in his reply. Well, Heck only applies if the person's in custody and he's trying to get loose. He's trying to collaterally attack his conviction. That's not what Guerrero says. Guerrero versus Gates, a Ninth Circuit opinion, 443 F3rd 697, says no, that doesn't apply. The prisoner in Guerrero had been released, was not incarcerated when he made this collateral attack. So it doesn't matter. You don't have to be incarcerated for Heck to provide the bar to the Section 1983 suit. Most of the Heck cases that we see, the defendant is already out of or not most, but many. So, yes, I don't think that's a controversial proposition. Okay. Well, there was a slight debarking from that in a case called Nonet, a Ninth Circuit case, and it involved earned time credits that a fellow wasn't given. And that really doesn't apply here. It's an absence of this. I just wanted to make sure we were clear on that. Let me just steer you to the claim, I guess, that gives me the most trouble. Yes, sir. That's obviously the unlawful seizure claim. I mean, I think most people would find what these officers did deeply disturbing, right? Because, as I understand it, the justification for killing the dogs, as opposed to removing them and, you know, taking them to shelter or whatever, was that there was this exigency that it was so important that child protection services get in to see that house before, I don't know what, I can't imagine what was so urgent that there wasn't time basically to, you know, I don't know, maybe even just wait for the defendant to be released, if that was something that might happen imminently. So I'd just like you to focus on that and explain why, how could a jury reasonably conclude that there was such an emergency that the dogs just had to be flat out killed rather than handled in a more humane way? I understood. There were a boatload of facts to support the exigency. It didn't just circulate around CPS's need to get in there on an emergent basis as characterized by Mr. Brown. And let me start there and then work backwards from CPS. CPS testified, de Gaulle, that it is important to get in there and document the evidence and preserve the evidence as close in time as when that child was there, the child had just been removed, because conditions change. This is out in the middle of nowhere. This is off the grid. This is 30 minutes, 40 minutes of dirt roads to the nearest paved road, where this occurs, the house, the trailer was pretty much open to the elements. There were holes in the floor that dogs climbed in and out of. The CPS lady, de Gaulle, testified that we needed to capture that as it existed then. And here's why that's so true. In the criminal case, and I attended the criminal trial personally, the argument was made by Mr. Harvey's defense attorney that you see these pictures, folks, of what DPS took of the premises? That was a day later. That was 12 hours later. It wasn't that bad when they left 12 hours before that morning, because the dogs had gotten in there and torn things up. So there is a logic to the exigency of getting CPS in there. But that's not the only exigency. And by the way, there was a jury instruction that I attached right at the beginning of my excerpt of record that talked and included and gave the exigency issue to the jury to decide. And that's what they did. But the other exigency involved this. Tina Heidinger, who ran the local Humane Society, she said we couldn't have taken these dogs. There's no way we could have taken these dogs. We --. Did they know that? Yes, because, and Tina testified, and Ron Jones, the animal control officer, both testified on prior occasions, they had taken maybe one or two dogs to this Humane Society in Pinetop, Arizona, and they were full up. They couldn't take them. So- They didn't call that day, though. They didn't- That's absolutely right. They did not call that day. They had, the numbers have differed between 36 and 50 dogs. And nobody made a checklist of how, exactly how many dogs, but somewhere in that capacity. And this was testified to at trial, too, by the animal control officer and by Tina Heidinger. The dogs had no tags. Nobody knew whether they were properly vaccinated. We had an expert witness who was the chief veterinarian of the Arizona Game and Fish Department, who had previously set up and ran rural animal control entities and departments who said, you cannot take dogs like these and introduce them into an environment with other dogs without running a high risk of disease and other problematic issues. The other problem of rescuing these dogs is that you have to pull them out of this compound, fence chain link, fence compound, one by one. And you do that with catch poles. You grab a dog around the neck with a catch pole and drag that dog out of the compound. That dog and these animal control officers, again, this was testimony, had experience doing that with other dogs around. You grab that dog and that dog starts fighting and yelling and squealing. All the other dogs pile on. Wolf pack mentality. I use the suggestion that this was a very unique situation and that whenever you find a situation like this, you would go ahead and shoot them. I mean, there's nothing else you can do. Is that what you're saying? In this case, there was no other viable option. In addition to everything I've said here, when the animal control officers arrived the next morning, and this again goes to the exigency, there are now three dogs that are dead and the other dogs are eating them. What are we going to do? We don't have much choice here. Field euthanasia became a legitimate option and it was done. And this is something that I want to say that's not in the briefing. When Ron Jones, the animal control officer who gave the order to shoot these dogs, was on the witness stand and Mr. Brown was going after him heavily, hotly, how could you just shoot these poor animals? How could you shoot these dogs? They're yelling, they're screaming. How could you shoot these dogs? Ron Jones looked at Mr. Brown and he said, Mr. Brown, nobody wants to shoot a dog. And there was a tear running down his cheek. That impacted these officers as well. They had a tough job to do, but they did their job. Distasteful, yes. Unfortunate, yes. Reasonable, yes. And that's what the jury decided based on all the facts. So I don't think there's any question that those were all questions of fact for the jury. The other issue with regard to the May 8th CPS search is absolute. Here's what I wondered when I read his reply. Suppose we walk in there on May 7th with the consent, the written consent, and there's somebody laying in the kitchen with a butcher knife sticking out of their chest. And we say, oh, gee, I'll bet our homicide detectives would like to take a look at this. So we call homicide detectives. Well, they can't get out there until the next morning. So what are we going to do? They can't get out there until the next morning. Do we have to then get a search warrant for the homicide detectives to come out and investigate a crime scene that we already are in and we can secure? I don't think the Constitution requires that. I'm not aware of any case that would require that. Let me ask you this. Yes, sir. I think one of your arguments is that the Child Protective Services is not a party to this case. Yes, sir. And they were the ones that went out on that other search that's being challenged here. Yes, sir. And you said, that's not us. We went out with them to kind of make sure that things were safe, to protect them. Yes, sir. But that was their search. Yes, sir. Now, we talked about Heck versus Humphrey and the cases, Harvey versus Waldron and all that was. So put those aside for a moment. Yes, sir. We know that's in the background. But isn't there an argument that when the police go out with the Child Protective Services and they are working with them and helping them carry out their responsibilities, that you were involved in that search? Isn't there a good argument that you were? Well, here, I will concede. I will tell you. We opened the gate for Child Protective Services to go into the compound. Yes. We opened the door to the dilapidated trailer residence for Child Protective Services to go in. But it was at all times during that May 8th event, Child Protective Services investigation. It was Child Protective Services that charged him with child neglect. See, he was convicted on two things, a sawed-off shotgun that we found on the May 7th that we charged him with, and the child neglect that CPS investigated and charged him with, and that CPS used their photographs and their testimony at the criminal trial to convict him of that. So that was their investigation. That was their... Well, officers, we often see that there are officers, state officers involved. There may be multiple federal agencies involved, and one of them may be prosecuting the case or behind the case, but the other is involved in the search. So the fact that Child Protective Services is the one that brought the charges wouldn't be dispositive of whether you were involved in the search, would it? Understood. But my recollection is that we did not, on May 8th, Navajo County Sheriff's Office, neither did deputies, documented or processed or found or located any evidence that was used for the child neglect charges. That was... We opened the doors, yes. I can't say we weren't there. We were there. We opened the doors, but it was their investigation. It was their inventorying of the evidence, and it was their presentation of that evidence at trial that got... Who argued the search was reasonable, nevertheless, right? Yes, sir. All right. Let me... Can I address the detention real quick? I don't know if there's any real issue in your minds about the detention. He was initially arrested on two grounds. One was the concealed carry, which in Arizona, that's actually legal without a permit now, but then you had to have a permit. And we knew that he didn't have a permit because we checked with GPS, and his daughter had told us he always carries a... She was specific, a loaded .357 caliber in his front pocket. So we stopped him, and although Mr. Warren raises the issue of the stop and probable cause for the stop in the briefing, he doesn't contest that here. And by the way, that was the beginning of the community caretaker doctrine because... And I put this Arizona Court of Appeals decision where Mr. Harvey challenged the stop in a motion to suppress and everything that flowed from it because that's where the community caretaker doctrine term comes up. And in that decision, which is part of my excerpt of record, the judge there, Judge Lamb, said that, well, given the circumstances, and you've heard all the circumstances of the threats and the danger to the public and the danger to the school and all that, and everybody's concerned about these things, we think the stop was justified by the community caretaker doctrine. And by the way, we also think, Judge Lamb said, there was reasonable suspicion for the stop independent of the community caretaker doctrine. Well, Mr. Warren seems to have seized upon that during the trial and when he called Jeff Adams in his case in chief for cross-examination, he starts going into the community caretaker doctrine to try to box everything that Jeff Adams did into this box called the community caretaker doctrine so that he could later cut the legs out from under it and say, you can't go that far, you can't incarcerate somebody under the community caretaker doctrine. It doesn't matter what the officer's subjective intent was here. He had a valid misdemeanor arrest for at least one charge, concealed carry without a permit, and he had the right to incarcerate him. The statute says you may release somebody with a misdemeanor. It doesn't say you can only put them in jail if you have a rational reason. Why did it take so long for Mr. Harvey to be released? I don't know the answer to that. We don't, well, a bail was set that he couldn't. Oh, okay, that's what I was wondering. Because my recollection is, and it was, you know, he's disabled, retired, whatever, he lives on Social Security, and I don't know if it's a $5,000 bail or something like that. He couldn't make the bail. Finally, after 27 days, the judge just said, okay, we're going to remove the bail and hand you off to somebody who swears they'll keep an eye on you. But a judge obviously set the bail, and he just wasn't able to. Yes, sir. Yes. Okay. All right. Your time has expired, but let me ask Judge Gould, do you have further questions for the Defendant's counsel? No, I don't. Thank you. Okay. Well, then let's, thank you, counsel. Let's hear from plaintiff's lawyer, maybe three minutes for rebuttal. Thank you, Your Honor. I'm really Warren Brown, not Mr. Warren. I know. I was checking the list, because. And despite Mr. Ottolett's pleas to use the pronoun, plural pronoun, we, when he's talking about the clients, he's really not part of it. Anyway, he raised the point of defense experts. Sure, Bernie Clark testified, and among other things, you'll see where I quoted him saying that search warrant was a real problem, because there was no informed consent for the May 8th search. When Ron Jones was out there on May 7th, May 7th was the day he decided to shoot the dogs. Dogs didn't have water, he said. He's an animal control guy. Dogs didn't have food. Well, you know from the record, there were 10 bags of food in Harvey's truck. Instead of feeding the dogs and giving them water, they decided to kill them.  I don't care how much expediency Mr. Ottolett will tell you was in play here. Expediency does not trump a man's constitutional rights. And this was a seizure and destruction of property. Dogs didn't have tags. They lived in rural Navajo County in an enclosed fence. There's no requirement that they have tags. All right. May 7th, no problem with the dogs. I cited line by line by line where Mr. Jones said no sick dogs, no vicious dogs, no attack dogs. And then at trial, he speculates, well, if we had, they might have. And that's just what you heard from Mr. Ottolett. But that's not fact. That's pure speculation. Number of dogs, Your Honors, you know why we can't put a number on the dogs? Was there speculation about whether one dog had eaten another dog? That wasn't part of the record. Excuse me? Was there record evidence to support that one dog, at least one dog or two dogs, had been eaten by the other dogs? Could you help me? One dog, he must have killed one dog before another dog had eaten a dog. You're talking about May 8th? Yeah, there was testimony from Ron Jones to that effect. The conclusion is that they were attacked by coyotes. I mean, there's no evidence to bet that the defense or that the plaintiff called testified that those dogs were all socialized with one another. And there's no reason to believe that ever happened. But I wanted to tell you the reason the number of dogs isn't pinned down is because Ron Jones and his crew loaded a bunch of them, but he doesn't know how many, into a truck, drove out in a farmer's grazing area and threw them out. So some of the dogs were left to rot in Harvey's house, in Harvey's house, in the house, around the house, and in some of the secured pens where some of the dogs were kept. Mr. Jones told us, and it's in the briefs again, he knew every rule and procedure to follow before destroying a dog, a cat, a cow, a goat. It's all in procedures that they should have followed. There's an allegation that this humane society couldn't have taken the dogs, but remember, nobody even called to ask. Ron Jones knew of four other shelters, including the shelter that took the four dogs that were with Harvey when he was arrested, called none of them. If anything, well, I'm not going to speculate. Community caretaker doctrine, the last thing, no matter what else is said in the final analysis, Deputy Jeff Adams, and this confirmed by his boss, the sheriff, said, I applied that doctrine to put Harvey in jail, but there was no threat. There was never a threat to the school or anybody else. There was a threat that occurred sometime earlier when Joanne, his 17-year-old daughter, was presumably much younger, and he said, the evidence said that he'd rather shoot her than have her go live with her stepfather. Who knows when, who knows the context, but the point is, when Ed Harvey was put in jail, he was put in jail under the basis of child protective services, I mean, under the basis of community caretaker doctrine. We're going to make sure you can't go harm your daughter. The absolute, that is the absolute final note I have, Your Honors. I thank you for the opportunity to rebut. Roberts. We thank both counsel for your excellent arguments this morning, and the case just argued will stand submitted.
judges: Oliver, Gould, Watford